| | | |
|---|---|---|
| **SANDRA JESSEE** | * | **IN THE** |
| **5919 Cypress Springs Road** | * | |
| **Elkridge, MD 21075** | * | **UNITED STATES** |
| | * | |
| **Plaintiff** | * | **DISTRICT COURT** |
| | * | |
| **v.** | * | **FOR THE DISTRICT** |
| | * | |
| **WR GRACE & CO. - CONN** | * | **OF MARYLAND** |
| **7500 Grace Drive** | * | |
| **Columbia, MD 21044** | * | |
| | * | |
| **Defendant** | * | |
| | * | **Case No.:** _____ |
| **SERVE ON:** | * | |
| **THE PRENTICE HALL** | * | |
| **CORPORATION SYSTEM, MA** | * | |
| **7 ST. PAUL STREET** | * | |
| **SUITE 820** | * | |
| **BALTIMORE, MD 21202** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Sandra Jessee (hereinafter "Plaintiff" or "Ms. Jessee"), by and through her attorneys, Paul

V. Bennett, Esq. and Bennett Legal Services, Inc., hereby sues WR Grace & Co. - Conn

(hereinafter referred to as "Defendant" or "WR Grace"), Defendant, and states as follows:

### JURISDICTION AND VENUE

1.    This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, § 42

U.S.C. 2000e, et seq. (hereinafter referred to as "Title VII") and the Maryland Fair

Employment Practices Act, Md. Code Ann., State Gov't, § 20-601, et seq. (hereinafter

referred to as "Maryland FEPA").

2.    That all the actions complained of herein took place in Maryland.

1

3.     That at all times relevant hereto, Plaintiff, was an employee of the Defendant in
       Maryland.

4.     That Defendant WR Grace is a chemical manufacturing company headquartered in
       Columbia, Maryland and employs 15 or more employees and is thus an "employer"
       within the meaning of Title VII and Maryland FEPA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.     On or about June 29, 2021, Plaintiff submitted a Charge of Discrimination with the
       Baltimore Community Relations Commission against Defendant and cross-filed with the
       U.S. Equal Employment Opportunity Commission. On or about March 16, 2022, the
       EEOC Baltimore Field Office issued Plaintiff a Notice of Right to Sue. Therefore,
       Plaintiff has properly exhausted her administrative remedies and this complaint has been
       filed in a timely manner.

## FACTS COMMON TO ALL COUNTS

6.     Plaintiff is and at all times mentioned herein was female.

7.     Plaintiff was first employed by Defendant WR Grace on or about May 13, 2013 in the
       company's Operations department. Plaintiff always performed her job at a level that met
       or exceeded Defendant's reasonable expectations. She was transferred to the Human
       Resources department at Defendant's Curtis Bay, Maryland facilities in 2017 and was
       promoted on or about July 1, 2020 to the position of Senior Manager of Human
       Resources, responsible for managing the company's human resources office and
       supervising other staff employees within the company's Human Resources department at
       both the Curtis Bay facility as well as the Cabot Warehouse.

8.    In her position as Senior Manager of the Curtis Bay Human Resources office, Ms. Jessee reported directly to Hal McComas, Regional Human Resources Director, (hereinafter "McComas") whose office was also located at the WR Grace Curtis Bay facilities.

9.    As of 2020, WR Grace maintained a benefit available to qualified employees in which said employees could request tuition reimbursement for educational costs by which Defendant would pay some or all the tuition costs for its employees pursuing educational opportunities.

10.    Beginning in late 2019 and into early 2020, Plaintiff discussed with both Mr. McComas and with a WR Grace in house legal counsel, John P. Forgach, her desire to attend law school and get a law degree, which she expressed to both said individuals her hope that doing so would make her a better HR Manager and could eventually land her a position in the WR Grace legal department.

11    Both Mr. McComas and Mr. Forgach were supportive and encouraging to Plaintiff to proceed with her applications to law schools in the local area and by April 2020, Plaintiff had been accepted to the University of Baltimore Law School.

12.    On or about April 29, 2020, Plaintiff submitted her application to WR Grace for tuition reimbursement, and did so in accordance with the policies and procedures established by Defendant WR Grace for doing so.

13.    The request for tuition reimbursement was initially delivered to Mr. McComas as per WR Grace's then existing policies and procedures.  Mr. McComas advised Ms. Jessee that her request for tuition reimbursement had been approved.  Plaintiff asked to get the paperwork signed, so she could submit it to the Grace Service Center as required under

3

the procedure.   The following week, Plaintiff was informed that there was a mistake in communication; Elizabeth Brown, (hereinafter "Ms. Brown") CHRO, had not approved the reimbursement.

14.     In May 2020, Plaintiff interviewed with Ms. Brown for the Sr. HR Manager, ISC role at the corporate headquarters in Columbia, Maryland.   During this interview, Plaintiff explained her rationale for going to law school, that she was looking to get a law degree versus the more common MBA that most employees request.   After this interview, Plaintiff was advised Ms. Brown had authorized ten thousand dollars ($10,000) for her tuition reimbursement in the 2021 Annual Operating Plan (AOP).   Plaintiff was then instructed to put a spreadsheet together showing the costs of each semester and the amount of scholarship money that she would be receiving.   Plaintiff was advised that her first request for reimbursement would not be reviewed until grades would come out in January 2021 because grades are a requirement for tuition reimbursement.   Plaintiff fully complied with her instructions and submitted a summary of tuition costs by semester less her scholarships awarded.   As of the summer of 2020, Plaintiff was given to understand that her tuition would be reimbursed for the Fall 2020 semester.

15.     Plaintiff contends that she was denied the role of Sr. HR Manager, ISC because she has two children.   During her interview with the hiring manager, Craig Jackman, Mr. Jackman expressed his concerns that Plaintiff would not be able to fulfill the responsibilities of the position because of family responsibilities as a mother of two children, despite the fact that Plaintiff had already been performing the role for about a month and a half with no conflicts with her children or family.

16.     Mr. Jackman informed Plaintiff that Katie Aldrich would be getting the job. He stated

that she was selected over Plaintiff because "she had more HR project management

experience." He acknowledged that Plaintiff had significant project management

experience, possibly just as much or more; however, Ms. Aldrich's project management

experience was directly related to HR. Ms. Aldrich did not have any children nor was

she pregnant at the time of the interview.

17.     Around June of 2020, after Plaintiff was notified by Mr. Jackman that she would not be

selected for the Senior HR Manager, ISC position, Plaintiff raised her concerns about this

discrimination based on gender and complained about it with her supervisor, Hal

McComas. She told him about Mr. Jackman's comment about her children. He told

Plaintiff that he had been asked to interview Ms. Aldrich to see if she could be a backfill

for Plaintiff as the Curtis Bay site HR Manager. Mr. McComas informed Plaintiff that

Ms. Aldrich did not have the skillset necessary for the Curtis Bay HR Manager role,

indicating that Plaintiff was the more qualified candidate. He also complimented

Plaintiff's work on the interim assignment by telling Plaintiff that she "made that job look

easy."

18.     Plaintiff was not the only female employee at Grace to be questioned about her ability to

do a job based on being a mother. In the third or fourth quarter of 2020, Grace conducted

focus groups with a select group of female employees. These focus groups were

coordinated by Shannon LoVette, VP of Talent Management. After the focus groups,

Elizabeth Brown, CHRO, shared some of the feedback with the HR team. She mentioned

that someone during the focus groups mentioned that they were questioned during an

5

interview about their ability to do the job and their commitment to the job because she had two children. Plaintiff was not part of the focus groups, so this was another employee who experienced a similar interview situation

19.    In July 2020, Plaintiff enrolled in classes at the University of Baltimore. Classes commenced in late August 2020. Throughout the fall semester, Plaintiff requested from Defendant information as to the $10,000 for tuition reimbursement that she had been told had been put into the 2021 AOP.

20.    By November 2020, Plaintiff still did not have a signed approval for reimbursement of her Fall 2020 tuition. She asked Mr. McComas when she would get an answer. He did not have a response. Plaintiff then complained to Mr. McComas that she thought she was being treated differently than her male colleagues. She pointed out to Mr. McComas that Matthew Clayton and Jason Fried, male employees at WR Grace who had also been approved for tuition reimbursement, were not being subjected to the same delays and equivocations as to the status of their tuition reimbursements.

21.    Matthew Clayton was at that time a production engineer at the Curtis Bay facility. He had worked for Defendant for approximately 3 years and was a lower level pay band employee. In July 2020, he applied for tuition reimbursement to get an MBA. Plaintiff herself had a role in approving his request. Grace was able to approve Mr. Clayton two months after Plaintiff had made her request for tuition reimbursement.

22.    Jason Fried, who was a supply planning lead at the time, had been approved for tuition reimbursement for an MBA prior to 2020. The WR Grace tuition reimbursement policy provided that employees can be reimbursed up to $10,000 per year for expenses related to

a graduate degree.  The $10,000 cap is based on the year the reimbursement is paid, not

the year the classes are taken.  Mr. Fried tried to argue that the policy had changed since

he was approved and that he should not be held to this requirement.  He requested an

exception to the $10,000 per year limit.  WR Grace granted an exception to the policy

that would allow him to recoup more than the $10,000 per year by allowing him to

request his additional expenses in the following year.

23.     Within a week of making this complaint about disparate treatment and sharing these

examples with Mr. McComas, Plaintiff finally had a response on her tuition

reimbursement request.  Mr. McComas informed her that her tuition would be reimbursed

for Spring 2021, but that she would have to seek out reapproval on a semester-by-

semester basis.  Plaintiff was told that her Fall 2020 classes would not be approved

because the policy stated that approval needed to be given prior to the classes starting.

Mr. McComas explained that the requirement to get semester-by-semester approval was

based on Plaintiff's "performance issues."  Up until this point in the year, neither Mr.

McComas nor anyone else had made mention of any performance problems to Plaintiff.

She asked Mr. McComas if "performance issues" was the reason it was not immediately

approved in May.  He responded with, "Yes."

24.     Based on information and belief, Plaintiff contends that there were four WR Grace

employees who were involved in the approval of her tuition reimbursement request.

They were her supervisor, Hal McComas; his supervisor, Craig Jackman; the Global HR

Director, Shana Douglas, and Elizabeth Brown, CHRO.  At the time of approval, Plaintiff

contends and thereon alleges that all four of these individuals approved Plaintiff's tuition

reimbursement immediately after her comment about being discriminated against based on gender.

25. Once Plaintiff's Spring 2021 grades were received, she followed the procedure to submit her expenses for approval. She filled out the necessary paperwork and submitted it along with her grades, receipts and class information to Mr. McComas and Karen Laudenberger, HR Manager, who was at that time Plaintiff's HR business partner who was also required to sign off on the reimbursement. Both signed off and Plaintiff was reimbursed by WR Grace for Spring 2021 classes.

26. Mr. McComas commented after Plaintiff's first semester that he could see the benefits of her law studies, particularly in her improved writing.

27. In early 2020, during a conversation about law school with John Forgach, he told Plaintiff about two other Grace employees who had obtained their law degrees while working for Grace, both of whom were male. One was a paralegal prior to getting his law degree and thereafter worked in the WR Grace legal department as an attorney. The second worked in Research and Development for Defendant. A law degree was not a requirement for either of these employees in their roles while they were in school.

28. At Plaintiff's midyear review, which took place in late June, 2020, Mr. McComas stated that "Sandra is on track for meeting expectations." On or about July 1, 2020, Plaintiff was promoted to Senior HR Manager and had her role expanded for a second time. She was asked to continue managing the Manufacturing Leadership Program (MLP) that she had worked on during the interim assignment as Sr. HR Manager, ISC. The MLP is a three-year rotational program that had approximately 21 engineers rotating through

8

Grace's facilities throughout the United States for three, one-year assignments. This program required Plaintiff to meet one-on-one with each engineer at least twice per year to discuss their current assignments and interests to determine the next assignment. Plaintiff also met with senior leadership at the corporate office to determine what locations needed an MLP and then again to share the assignments to find out if any changes needed to be made. Plaintiff maintained headcount data on the program, created virtual lunch-and-learns for the engineers, participated in the hiring of all new engineers, and ensured engineers leaving the program had a fulltime spot in a position that interested them. This was a large increase in Plaintiff's already large workload. This was also a large reduction to the responsibilities of the Sr. HR Manager, ISC. Plaintiff thereby contends she was continuing to meet and exceed expectations, given the large increase in responsibilities assigned to her.

29.   Mr. McComas officed next door to Plaintiff. He had ample opportunities to share feedback with Plaintiff, as did others in Plaintiff's chain of command, yet neither he nor anyone else ever shared any negative feedback with Plaintiff prior to November 2020. At that time, Mr. McComas told Plaintiff that her tuition reimbursement had not been approved due to "performance issues." Plaintiff was shocked, as this was the first mention of performance issues all year. At this time, Mr. McComas told Plaintiff that he would not go into specifics because he was not prepared for a performance discussion. Plaintiff's tuition was being denied for performance issues that Mr. McComas could not share with her because they, in fact, did not really exist. Plaintiff asked if this meant she

9

would be getting a rating of "2" on her Performance and Development Review (PDR).

He responded, "Yes."

30.   Mr. McComas completed Plaintiff's PDR in late February 2021 and met with her during

the last week of February, 2021.  Mr. McComas did not have data to support a "2" rating,

so he had gone out to everyone that he thought Plaintiff may have worked with to elicit

any negative feedback he could find.  He did not verify the information given.  One

example is that he spoke with Marc Cottman, site Operations Manager.  Mr. Cottman had

started mid-2020.  One of the requirements was that Plaintiff work with Mr. Shiels to

create an onboarding plan for him.  Mr. McComas claimed that Plaintiff had not done this

task and proceeded to document such in her PDR.  When Plaintiff told Mr. McComas in

the meeting that it was not true, he shrugged it off and documented her comment.  After

the meeting, Plaintiff followed up with Mr. Shiels through MS Teams chat.  He

confirmed that Mr. Cottman had been given the 30-60-90-day onboarding plan that had

been created for him and even sent Plaintiff a copy.  She forwarded this to Mr.

McComas.  It took less than five minutes to confirm that this was an incorrect claim.

Plaintiff thereafter reached out to corporate to have her PDR returned to Mr. McComas,

so he could edit it, which he did.

31.   WR Grace's normal policy was that it was expected that managers speak with their direct

reports on a regular frequency throughout the year to discuss performance issues.

Nothing in a PDR should be a surprise.  Because Mr. McComas had to go searching for

performance issues at the end of the year, much of the PDR was a complete surprise to

Plaintiff.  When she mentioned this to Mr. McComas, he told her that he had given

10

Plaintiff a "3" rating, but he was forced to change it to a "2." He also mentioned that he
had to follow up on an incident that Ms. Brown was concerned with at the calibration
session that involved Plaintiff and a member of the Talent Acquisition (TA) team. He did
not share anything further with Plaintiff about that at the time, although she asked what
the situation was, so she could have a specific example to improve her performance.
Plaintiff followed up with this incident a few weeks later, at which time Mr. McComas
told her that he spoke with every member of the TA team and not one of them knew
anything about the incident that Ms. Brown was referring to that made her insist on a
rating of "2." Plaintiff asked Mr. McComas to go back to Ms. Brown to share that there
was no such incident. Based on information and belief, Plaintiff contends that Mr.
McComas never took any such requested action.

32.    During the above referenced PDR discussion, Plaintiff told Mr. McComas that she
thought her PDR rating was lowered in retaliation for her complaint of gender
discrimination around the tuition reimbursement. Mr. McComas did not respond. After
her PDR meeting in February 2021, Plaintiff put in her final employee comments that she
thought the PDR score was retaliation for her complaints about being treated differently
than her male colleagues with respect to tuition reimbursement.

33.    Mr. McComas never addressed Plaintiff's comments of retaliation, nor did he sign off on
her 2021 PDR. Grace HR policy was that Mr. McComas was required to follow up with
managers until every PDR is signed by the employee and manager. PDR forms show as
incomplete until all signatures have been obtained.

11

34.   In March 2021, Plaintiff's performance bonus for 2020 was paid at 85%. The guidelines for 2020 bonuses were that those rated a "3" should be paid out 95-100% of their bonus. Those rated a "2" should be paid out 85-95% of their bonus. Plaintiff was paid out 85% which was the lowest possible bonus for her rating. When Mr. McComas told Plaintiff her bonus amount, Plaintiff questioned why he docked it the maximum amount. Mr. McComas replied, "That's just the number HR gave me, and I am passing it down." It is important to note that managers are responsible for determining bonus amounts. They can be changed by the higher-level managers, but HR does not change bonus amounts, indicating it was Mr. McComas, Mr. Jackman, or Ms. Brown who elected to reduce Plaintiff's bonus by the maximum amount.

35.   From April 2021 to the beginning of June, 2021, the Curtis Bay facility was recruiting for an Operations Manager, ART. There were two top candidates in consideration, Andrew Guilliams, Operations Leader, OMC and Rachel Snitzer, Operations Leader, ART. The operations leader roles had been created a few years prior as training positions for future operations managers.

36.   Prior to the application and interview process, both Ronald Shiels, Site Director, and Marc Cottman, Site Operations Manager, had expressed that Mr. Guilliams was their top candidate. Mr. Shiels had commented in succession planning meetings that he did not think that Ms. Snitzer was interested in promoting to the Operations Manager position. Mr. Cottman had a discussion with Ms. Snitzer and shared with the team that Mr. Shiels's perception was incorrect, and she was interested in promoting to the operations manager role.

12

37.     During the interview debriefs, Plaintiff pointed out some responses that showed negative
        unconscious biases to women in leadership roles.  The team pointed out that Mr.
        Guilliams, who is over 6 feet tall, had more of a presence than Ms. Snitzer, who stands
        closer to 5 feet tall.  Additional comments involved discussing Ms. Snitzer's personality
        versus discussing Mr. Guilliams skills.  As these comments were made, Plainfiff asked
        everyone to consider their unconscious biases before they vote for the best candidate to
        ensure they were looking at each candidate's skills.  After her comment, the vote was
        split 3 to 3.

38.     Ultimately, the final selection is determined by the hiring manager with input from the
        hiring team.  Because the interview debrief was concluded without a selection confirmed,
        Plaintiff scheduled a meeting with Mr. Cottman, the hiring manager, and his supervisor,
        Mr. Shiels.  Mr. Shiels made it clear that he wanted to hire Mr. Guilliams for the role.  He
        expressed concern that the previous manager, Mr. Peters had not been successful.  Ms.
        Snitzer reported to Mr. Peters, so he was concerned that putting Ms. Snitzer in the role
        would give more of the same results.  Mr. Shiels tried to project Mr. Peter's past poor
        performance on to a future expectation of Ms. Snitzer's performance.  However, he did
        not have a similar concern with the position had been open the previous time, and he
        promoted Mr. Peters from Operations Leader, ART to Operations Manager, ART.

39.     During this conversation, Plaintiff shared some of the Curtis Bay history with Mr.
        Cottman.  She shared that in her eight (8) years at Curtis Bay, she had never seen a
        female promoted in operations.  Any female wishing to promote had to take a job at
        Columbia or move into a support function.  The perception of the glass ceiling at Curtis

13

Bay was so prevalent that Plaintiff even had a male colleague ask her if she had a concussion yet "from hitting your head so hard on the glass ceiling."

40.     Mr. Cottman stated that he did not want to propagate this perception of a glass ceiling, so he was going to select Ms. Snitzer. He agreed that she was doing well in the role and would be able to be successful going forward. Mr. Shiels was visibly upset by this and immediately left the video conference call.

41.     Based on information and belief, Mr. Shiels then requested that Plaintiff be terminated. In late April, Mr. McComas made a random comment about Plaintiff not wanting to be Mr. Shiels' business partner. Mr. McComas was referencing a conversation that had occurred the previous November and had taken her comment out of context. Mr. McComas reached out to a Curtis Bay leader, presumably Mr. Shiels, to see if he would hire Plaintiff for an operations leadership position. There was no justification for this request. Plaintiff had not applied for any operations leadership roles at Curtis Bay, nor had she had any discussions with anyone on wanting an operations leadership role. This was purely an email fishing for a specific response to create some basis for termination. The next day after the email response was received, Mr. McComas scheduled Plaintiff's termination meeting.

42.     Mr. Shiels had a history of demonstrating gender biases. In March 2017, there was an opening for the Operations Manager, FCC position. Mr. Shiels was the hiring manager for this position. On March 27, 2017, Plaintiff had told him that she was interested in applying. She asked him what she needed to do to ensure she was considered for the role. He informed Plaintiff that the position would be posted on the company website

with the other job postings.  The job was never posted.  The week of April 3, 2017, Mr.

Shiels came to Plaintiff's office to let her know he had decided the candidate for the

Operations Manager, FCC position.  It would be going to an internal candidate, Alex

Nowodazkij (male).  The position was never posted, and Plaintiff was never given the

opportunity to apply.  According to Mr. Shiels, Mr. Nowodazkij got the position because

he was recommended by the previous Operations Manager, Karl Mortimer.

43.      In April 2017, there was an opening for the Operations Manager, ART position.  Again,

Mr. Shiels was the hiring manager for this position.  This time the position was posted,

and Plaintiff applied.  She interviewed on May 4, 2017.  All her interviews went well.

On June 27, 2017, Plaintiff had a meeting with Mr. Shiels to discuss her development

plan.  He said that Plaintiff was "definitely promotable," and that she was still a candidate

for the Operations Manager, ART position.  However, he was holding off awarding her

the position because he wanted to get a bigger candidate pool.  On August 17, 2017, Mr.

Shiels notified Plaintiff that Robert "Bobby" Peters had been awarded the position.  He

responded that Mr. Peters was selected because he had been filling in for the role for

several months now.  Basically, Mr. Shiels delayed the hiring process, so he could train

Mr. Peters for the role to make him more qualified than Plaintiff.  It is important to note

that in late 2016, both Mr. Peters and Plaintiff were operations leaders in ART and EM,

respectively.  Plaintiff was asked to trade positions with Mr. Peters because site

leadership did not think he had the right leadership skills for the ART facility.  Plaintiff

declined the trade because it would have been her fourth operations leader position.  She

expressed that she was looking for a promotion instead of another lateral move.

15

44.     On or about June 8, 2021, Plaintiff was notified that her employment with WR Grace was
        to be terminated effective July 6, 2021. Plaintiff was told initially that she did not have
        the right leadership skills for the position, and later that her termination was due to an
        inability to have a positive working relationship with her main customer, Mr. Shiels and
        that she had a "harsh" communication style.  While her working relationship with Mr.
        Shiels was negatively documented in Plaintiff's PDR, that it was stated that she needed to
        improve her relationship with Mr. Shiels in 2021, the same concern was not documented
        in Mr. Shiels' PDR.  There was no expectation that he improve his working relationship
        with Plaintiff.

45.     There are two male employees at Curtis Bay with similar so-called "harsh"
        communication styles.  They are Fred Zoback and Glenn Evans.  There have not been
        discussions about these two employees being terminated for their communication style.

46.     That the discriminatory employment practices as well as the various instances of
        retaliation as set forth above have caused Plaintiff to suffer lost earnings and earning
        capacity, severe emotional distress, humiliation, and mental anguish.

## COUNT I
## GENDER DISCRIMINATION
## 42 U.S.C. § 2000e et seq.

47.     Plaintiff hereby restates and incorporates paragraphs 1 through 46 of this Complaint as
        though fully set forth herein.

48.     That Defendant carried out the aforementioned acts of discrimination against Plaintiff on
        the basis of her gender (female).

49.     That the aforementioned acts constitute unlawful practices pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

50.   That the effect of the practices complained of above was to deprive Plaintiff of equal
employment opportunities and otherwise adversely affect her status as an employee
because of her gender (female).

51.   That the unlawful employment practices complained of above were intentional.

52.   That the discriminatory actions, as set forth above, have caused Plaintiff to suffer lost
earnings and earning capacity, severe emotional distress, humiliation and mental anguish.

53.   That the intentional discriminatory actions of Defendant, as alleged above, were done
with malice and/or with reckless indifference to Plaintiff's rights.

54.   Defendant improperly and illegally based its decision to hire another person for the
promotion Plaintiff sought, as well as its decision to deny tuition reimbursement benefits,
and to terminate Plaintiff's employment on the basis of her gender (female).

55.   Examples of how Plaintiff was treated in a disparate manner from her male comparators
include: two male employees at Curtis Bay with similar so-called "harsh" communication
styles. They are Fred Zoback and Glenn Evans. There have not been discussions about
these two employees being terminated for their communication style. Matthew Clayton
and Jason Fried, male employees at WR Grace who had also been approved for tuition
reimbursement, were not being subjected to the same delays and equivocations as to the
status of their tuition reimbursements. While her working relationship with Mr. Shiels
was negatively documented in Plaintiff's PDR, and it was stated that she needed to
improve her relationship with Mr. Shiels in 2021, the same concern was not documented

17

in Mr. Shiels' PDR.  There was no expectation that he improve his working relationship with Plaintiff.

56.     That the discriminatory employment practices as set forth above have caused Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

WHEREFORE, Plaintiff prays for judgment in her favor and an award of damages as set forth below.

**COUNT II**
**GENDER DISCRIMINATION**
**Maryland Fair Employment Practices Act (FEPA)**
**Md. Code Ann., State Gov't, § 20-601 et seq.**

57,     Plaintiff hereby restates and incorporates paragraphs 1 through 46 of this Complaint as though fully set forth herein.

58.     That Defendant carried out the aforementioned acts of discrimination against Plaintiff on the basis of her gender (female).

59.     That the aforementioned acts constitute unlawful practices pursuant to Maryland's Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 et seq.

60.     That the effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her gender (female).

61.     That the unlawful employment practices complained of above were intentional.

62.     That the discriminatory actions, as set forth above, have caused Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation and mental anguish.

63.   That the intentional discriminatory actions of Defendant, as alleged above, were done with malice and/or with reckless indifference to Plaintiff's rights.

64.   Defendant improperly and illegally based its decision to hire another person for the promotion Plaintiff sought, as well as its decision to deny tuition reimbursement benefits, and to terminate Plaintiff's employment on the basis of her gender (female).

65.   Examples of how Plaintiff was treated in a disparate manner from her male comparators include: two male employees at Curtis Bay with similar so-called "harsh" communication styles. They are Fred Zoback and Glenn Evans. There have not been discussions about these two employees being terminated for their communication style. Matthew Clayton and Jason Fried, male employees at WR Grace who had also been approved for tuition reimbursement, were not being subjected to the same delays and equivocations as to the status of their tuition reimbursements. While her working relationship with Mr. Shiels was negatively documented in Plaintiff's PDR, and it was stated that she needed to improve her relationship with Mr. Shiels in 2021, the same concern was not documented in Mr. Shiels' PDR. There was no expectation that he improve his working relationship with Plaintiff.

66.   That the discriminatory employment practices as set forth above have caused Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

WHEREFORE, Plaintiff prays for judgment in her favor and an award of damages as set forth below.

19

## COUNT III
## RETALIATION
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e et seq.

67.    Plaintiff hereby restates and incorporates paragraphs 1 through 46 of this Complaint as
       though fully set forth herein.

68.    As identified in the above facts, Plaintiff had made several complaints to management
       about gender - based discrimination or retaliation, including without limitation, June of
       2020, after Plaintiff was notified by Mr. Jackman that she would not be selected for the
       Senior HR Manager, ISC position, Plaintiff raised her concerns about this discrimination
       based on gender and complained about it with her supervisor, Hal McComas.  Also, in
       November 2020, when Plaintiff still did not have a signed approval for reimbursement of
       her Fall 2020 tuition, she asked Mr. McComas when she would get an answer.  When he
       did not have a response, Plaintiff then complained to Mr. McComas that she thought she
       was being treated differently than her male colleagues.  During the above referenced PDR
       discussion, Plaintiff told Mr. McComas that she thought her PDR rating was lowered in
       retaliation for her complaint of gender discrimination around the tuition reimbursement.
       After her PDR meeting in February 2021, Plaintiff put in her final employee comments
       that she thought the PDR score was retaliation for her complaints about being treated
       differently than her male colleagues with respect to tuition reimbursement. Each of these
       complaints are legally protected activities.

69.    The subsequent acts of Defendants in refusing Plaintiff's tuition reimbursement, denying
       her promotional opportunities, lowering her bonuses, and terminating her employment

etc. amounted to illegal retaliation under Title VII.

70. That the effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee in retaliation for Plaintiff engaging in legally protected acts of complaining of discrimination and retaliation.

71. That the unlawful employment practices complained above were intentional.

72. That the retaliatory employment practices as set forth above has caused Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation, and mental anguish.

73. That the intentional retaliatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

WHEREFORE, Plaintiff prays for judgment in her favor and an award of damages as set forth below.

## COUNT IV
### RETALIATION
### Maryland Fair Employment Practices Act (FEPA)
### Md. Code Ann., State Gov't, § 20-601 et seq.

74. Plaintiff hereby restates and incorporates paragraphs 1 through 46 of this Complaint as though fully set forth herein.

75. As identified in the above facts, Plaintiff had made several complaints to management about gender - based discrimination or retaliation, including without limitation, June of 2020, after Plaintiff was notified by Mr. Jackman that she would not be selected for the Senior HR Manager, ISC position, Plaintiff raised her concerns about this discrimination

21

based on gender and complained about it with her supervisor, Hal McComas.  Also, in

November 2020, when Plaintiff still did not have a signed approval for reimbursement of

her Fall 2020 tuition, she asked Mr. McComas when she would get an answer.  When he

did not have a response, Plaintiff then complained to Mr. McComas that she thought she

was being treated differently than her male colleagues.  During the above referenced PDR

discussion, Plaintiff told Mr. McComas that she thought her PDR rating was lowered in

retaliation for her complaint of gender discrimination around the tuition reimbursement.

After her PDR meeting in February 2021, Plaintiff put in her final employee comments

that she thought the PDR score was retaliation for her complaints about being treated

differently than her male colleagues with respect to tuition reimbursement. Each of these

complaints are legally protected activities.

76.   The subsequent acts of Defendants in refusing Plaintiff's tuition reimbursement, denying

her promotional opportunities, lowering her bonuses, and terminating her employment

etc. amounted to illegal retaliation under Maryland's Fair Employment Practices Act,

Md. Code Ann., State Gov't, § 20-601 et seq..

77.   That the effect of the practices complained of above was to deprive Plaintiff of equal

employment opportunities and otherwise adversely affect her status as an employee in

retaliation for Plaintiff engaging in legally protected acts of complaining of

discrimination and retaliation.

78.   That the unlawful employment practices complained above were intentional.

79.   That the retaliatory employment practices as set forth above has caused Plaintiff to suffer

lost earnings and earning capacity, severe emotional distress, humiliation, and mental

anguish.

80.     That the intentional retaliatory actions complained of above were done with malice

        and/or with reckless indifference to Plaintiff's rights.

WHEREFORE, Plaintiff prays for judgment in her favor and an award of damages as set forth

        below.

## PRAYER FOR DAMAGES

        WHEREFORE, for the foregoing reasons, Sandra Jessee, Plaintiff, requests this

Honorable Court enter judgment against Defendant, WR Grace, in the amount of three hundred

fifty thousand dollars ($350,000.00) as compensatory damages, for punitive damages of one

million dollars ($1,000,000.00) plus prejudgment interest, Plaintiff's attorney's fees, court costs,

and for such other and further relief as this Honorable Court deems just and equitable.

                                Respectfully submitted,

                                Paul V. Bennett, Esq., Federal Bar No. 10324
                                Bennett Legal Services, Inc.
                                5457 Twin Knolls Road, Suite 300
                                Columbia, Maryland 21045
                                Telephone: (888) 288-9787
                                Facsimile: (888) 292-2158
                                Email: pbennett@bennettlaw.net

                                *Attorneys for Plaintiff*